```
UNITED STATES DISTRICT COURT              (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
CHEVRON CORPORATION,               :  11 Civ. 3718 (LAK) (JCF)
                                   :
            Plaintiff,             :      MEMORANDUM
                                   :      AND  ORDER
    - against -                    :
                                   :
MARIA AGUINDA SALAZAR, et al.,     :
                                   :
            Defendants,            :
                                   :
         - and -                   :
                                   :
STEVEN DONZIGER, et al.,           :
                                   :
            Intervenors.           :
- - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

The defendants in this case, known collectively as the Lago Agrio plaintiffs (the "LAPs"), obtained a multi-billion dollar judgment against Chevron Corporation ("Chevron") in Ecuador based on claims of environmental pollution caused by Texaco, Inc. ("Texaco"), which was subsequently acquired by Chevron.  In this proceeding, Chevron seeks a declaration that the Ecuadorian judgment is not enforceable outside Ecuador and an injunction preventing its enforcement.  Chevron has sought support for its claims by, among other things, serving subpoenas on attorneys involved in the representation of the LAPs: Laura Garr, Andrew Woods, Joseph C. Kohn, and the firm of Kohn, Swift & Graf, P.C. (collectively, the "Respondents").  The Respondents objected to the

subpoenas, asserted the attorney-client privilege and the work
product doctrine, and provided privilege logs.  The LAPs join the
Respondents and assert privileges on their own behalf.[1]  Chevron
contends that none of the documents at issue may be withheld
because, among other reasons, (1) any discovery immunity was
forfeited by the lead attorney in the Lago Agrio litigation, Steven
R. Donziger, when he failed to provide a timely privilege log and
(2) the crime-fraud exception to the attorney-client privilege and
the work product doctrine apply to the documents at issue.  Chevron
has moved to compel the production of the withheld documents.

Background[2]

In November 1993, a group of Ecuadorian individuals filed a
class action in this Court, alleging that Texaco's oil operation

---

[1] Only two of the Ecuadorian plaintiffs have appeared in this
lawsuit; the others have defaulted.  Chevron Corp. v. Donziger, No.
11 Civ. 691, 2011 WL 1408386, at *1 n.2 (S.D.N.Y. April 6, 2011).
That fact, however, is not material to the instant motions.

[2] The full factual background of this litigation has been
described in prior opinions in this case as well as in numerous
decisions in related cases in this district and elsewhere.  See,
e.g., In re Chevron Corp., __ F.3d __, Nos. 10-4699, 11-1099, 2011
WL 2023257 (3d Cir. May 25, 2011); Chevron Corp. v. Salazar, No. 11
Civ. 3718, 2011 WL 2207555 (S.D.N.Y. June 2, 2011); Chevron Corp.
v. Donziger, No. 11 Civ. 691, 2011 WL 2150450 (S.D.N.Y. May 31,
2011); Chevron Corp. v. Donziger, 768 F. Supp. 2d 581 (S.D.N.Y.
2011); In re Chevron Corp., 749 F. Supp. 2d 141 (S.D.N.Y.), aff'd,
409 Fed. Appx. 393 (2d Cir. 2010); In re Chevron Corp., 709 F.
Supp. 2d 283 (S.D.N.Y. 2010), aff'd sub nom. Chevron Corp. v.
Berlinger, 629 F.3d 297 (2d Cir. 2011).  Accordingly, I will
summarize here only those facts necessary to resolution of the
current motions.

activities had caused massive environmental damage to the rain forest in that nation. Aguinda v. Texaco, Inc., 303 F.3d 470, 473 (2d Cir. 2002). While that action was pending, the government of Ecuador released Texaco from any claims for environmental damage in return for Texaco's completing certain remediation. Chevron Corp., 768 F. Supp. 2d at 598. In connection with that agreement, the government of Ecuador represented that the claims asserted in the Aguinda action belonged solely to it. Id. However, in 1999, Ecuador enacted the Environmental Management Act of 1999, creating a private right of action for damages for environmental harms. Id. at 599.

On the motion of Texaco, the Aguinda case was dismissed on forum non conveniens grounds, and that decision was affirmed by the Second Circuit. Aguinda, 303 F.3d at 480. Accordingly, the LAPs, who included many of the Aguinda plaintiffs, filed suit in Lago Agrio, Ecuador. Chevron Corp., 768 F. Supp. 2d at 600.

> The Lago Agrio litigation, though it was brought on behalf of similar and, in many cases, the same individuals, was a fundamentally different lawsuit than Aguinda. Aguinda sought predominantly damages for the plaintiffs and class members for injuries to person or property that each allegedly had suffered. The LAPs, however, sued in something akin to a parens patriae capacity to require the defendants to perform, or to pay the cost of performing, environmental and other remediation methods.

Id. at 600-01. On February 4, 2011, the Ecuadorian court issued a

judgment against Chevron of approximately 18 billion dollars.  Id. at 620-21.

In the meantime, Chevron commenced an arbitration in 2009 under the Bilateral Investment Treaty between the United States and Ecuador (the "BIT") pursuant to United Nations Commission on Trade Law rules.  In re Chevron Corp., 709 F. Supp. 2d at 288.  It sought a declaration that it bore no liability for the alleged environmental damage at issue in the Lago Agrio litigation, and it charged that the government of Ecuador had abused its criminal justice system by bringing criminal charges against two of Chevron's lawyers who had been involved in the earlier agreement releasing Texaco from environmental claims.  Id.

Chevron initiated a series of applications pursuant to 28 U.S.C. § 1782 to issue subpoenas in this country to obtain documents and testimony for use in foreign proceedings, namely the Lago Agrio litigation, the BIT arbitration, and the Ecuadorian criminal proceedings.  Id. at 284; Chevron Corp., 768 F. Supp. 2d at 605.  As will be discussed further below, Chevron unearthed information, including outtakes from a documentary film about the Lago Agrio case, that could prove useful in the foreign proceedings and in undermining the enforceability of the Ecuadorian court's judgment.  According to Chevron, that information shows that the LAPs' attorneys sought to intimidate the Ecuadorian judiciary,

4

Chevron Corp., 768 F. Supp. 2d at 611-12, discussed using mass demonstrations to bring pressure to bear on Chevron and on the Ecuadorian courts, id. at 612-13, provided a fictitious expert report to the Lago Agrio court, id. at 605-06, ghostwrote the report of a purportedly independent court-appointed expert, id. at 606-10, and then submitted a new, supposedly independent expert analysis that was merely a repackaged version of the court-appointed expert's tainted report, id. at 610-11.

In one of the Section 1782 proceedings filed in this district, Chevron sought information from Mr. Donziger, who had represented the plaintiffs in the Aguinda case and who effectively masterminded the Lago Agrio litigation.  This proceeding, 10 MC 2 (the "Section 1782 proceeding"), was assigned to the Honorable Lewis A. Kaplan, U.S.D.J., who had previously presided over the proceedings in which Chevron had gained access to information related to the documentary film.  See In re Chevron Corp., 709 F. Supp. 2d 283.  Mr. Donziger and the LAPs moved to quash the Donziger subpoena, but Judge Kaplan denied the motion.   In re Chevron Corp., 749 F. Supp. 2d 170 (S.D.N.Y.) ("Chevron 11/30/10 Opinion"), aff'd, 409 Fed. Appx. 393 (2d Cir. 2010).[3]  Then, when Mr. Donziger failed to submit a timely

---

[3] Because more than one of the opinions issued in this case appear in the same volume of the Federal Supplement, I am identifying them by date to avoid confusion.

privilege log with respect to the subpoenaed documents, Judge Kaplan held that any privilege had been waived.  In re Chevron Corp., 749 F. Supp. 2d 135, 140 (S.D.N.Y.) ("Chevron 10/20/10 Opinion"), aff'd, 409 Fed. Appx. 393 (2d Cir. 2010); Chevron 11/30/10 Opinion, 749 F. Supp. 2d at 185.  As will be seen, the scope of that waiver is critical to the analysis of privilege in this case.

Shortly before judgment issued in the Lago Agrio litigation, Chevron filed an action in this Court, alleging that the LAPs, their attorneys, various consultants, and a number of environmental activist groups had engaged in a racketeering conspiracy "to coerce Chevron into paying billions of dollars" to them "through a multi-faceted campaign of lies, fraud, threats and official corruption," in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.  (11 Civ. 691, Complaint, ¶ 306).  In the ninth cause of action in the complaint, Chevron sought a declaratory judgment pursuant to 28 U.S.C. § 2201(a) establishing that any judgment by the Lago Agrio court would be unenforceable on the ground that it would have been obtained through fraud and without procedures compatible with due process.  (11 Civ. 691, Complaint, ¶¶ 392-96).

On June 1, 2011, Judge Kaplan severed the ninth cause of action from the RICO complaint and directed that it proceed as a

separate case under its own docket number.   (Order dated June 1,
2011).  That became the instant action.  Meanwhile, Chevron served
on Ms. Garr, Mr. Woods, Mr. Kohn, and Kohn, Swift & Graf, P.C. the
subpoenas that are the subject of these motions.  (Subpoena to
Laura J. Garr dated May 20, 2011, attached as Exh. 1 to Declaration
of Kristen L. Hendricks dated June 10, 2011 ("Hendricks 6/10/11
Decl."); Subpoena to Andrew Woods dated May 20, 2011, attached as
Exh. 2 to Hendricks 6/10/11 Decl.; Subpoena to Joseph C. Kohn dated
May 20, 2011, attached as Exh. 1 to Declaration of Anne Champion
dated June 15, 2011 ("Champion 6/15/11 Decl."); Subpoena to Kohn,
Swift & Graf, P.C., attached as Exh. 2 to Champion 6/15/11 Decl.).
The Respondents objected to the subpoenas, asserting the attorney-
client privilege and the work product doctrine, and submitted
privilege logs identifying the documents at issue.  Chevron then
filed the instant motions to compel.

On July 19, 2011, I held a hearing to permit counsel to expand
upon the arguments raised in their briefs and to explore the
relationships between each Respondent and Mr. Donziger.  At the
conclusion of that proceeding, I reserved decision but issued
tentative determinations designed to guide the parties and
facilitate final resolution of the motions.  (Transcript of
Proceedings dated July 19, 2011 ("Tr.") at 152-54).  With respect
to the impact of Mr. Donziger's waiver of privileges in the Section

7

1782 proceeding, I found that it applies to "all documents that Donziger should have produced or logged in response to Chevron's subpoena, in the 1782 proceeding." (Tr. at 152). And, because Mr. Donziger had the practical ability to obtain documents from each of the Respondents, I determined that any documents within their possession that he had failed to log in a timely manner were subject to the forfeiture of privilege he was deemed to have committed. (Tr. at 152).

As to the crime-fraud exception, I concluded that Judge Kaplan had made findings that required application of that exception to information relating to three different subjects: (1) the report to which an expert's name had fraudulently been appended (the "Calmbacher report"); (2) the report that was purportedly independent but had been ghostwritten by agents of the LAPs (the "Cabrera report"); and (3) the memoranda that were purportedly independent reports intended to supercede the Cabrera report, but which in fact simply repeated that report's findings (the "cleansing memos"). (Tr. at 152-53). I further found that the crime-fraud exception was limited to these areas and that there was not sufficient evidence to support Chevron's assertion that the entire Lago Agrio litigation was fraudulent from its inception. (Tr. at 153). Finally, I concluded that there was no evidence of criminal or fraudulent intent on the part of the Respondents but

8

noted that such evidence would not be necessary for the crime-fraud exception to apply.  (Tr. at 153).

I then turned to applying my findings to the documents at issue.  I directed the Respondents first to identify any documents that they believed fell outside the forfeiture of the privilege caused by Mr. Donziger.  (Tr. at 153).  Chevron was then to identify from that list any documents that it argued fell within the crime-fraud exception because they were in furtherance of the alleged frauds related to the Calmbacher report, the Cabrera report, or the cleansing memos.  (Tr. at 154).  Then, to the extent that any dispute remained, I agreed to review the controverted documents in camera.  (Tr. at 153, 155-56).

In compliance with my directives, counsel for Ms. Garr and Mr. Woods submitted a letter discussing the relationship between my preliminary rulings and the documents within their possession. (Letter of Elliot R. Peters dated July 22, 2011 ("Peters Letter")). Counsel interpreted my findings as imposing a subject matter waiver with respect to the conduct of the Lago Agrio litigation, as a consequence of which Ms. Garr and Mr. Woods had no responsive documents not covered by the waiver.  (Peters Letter at 1-2).[4] Counsel also noted that he did not understand the waiver to apply

---

[4] As will be discussed below, this construction of my ruling is somewhat too broad and creates a logistical complication.

to communications between himself and his clients in this proceeding.[5]  (Peters Letter at 2 n.1).

Counsel for Mr. Kohn and Kohn, Swift & Graf, P.C. (collectively, the "Kohn Respondents") also submitted a letter, likewise indicating that all of the documents they had logged were subject to waiver of privilege under my ruling, with the exception of certain documents that were logged inadvertently and which are not responsive to the subpoenas.  (Letter of Patricia M. Hamill dated July 22, 2011 ("Hamill Letter")).  The issue of the inadvertently logged documents will be resolved below.

Finally, Chevron's counsel submitted his response.  (Letter of Randy M. Mastro dated July 27, 2011 ("Mastro Letter")).  Since none of the Respondents had identified documents beyond the scope of the waiver, it was unnecessary for him to identify residual documents that, in Chevron's view, would be subject to the crime-fraud exception.  (Mastro Letter at 1).  Chevron did, however, take issue with the attempt of counsel for the Kohn Respondents to "claw back" purportedly non-responsive documents.  (Mastro Letter at 1-2).

The pending motions are now ripe for a full decision, facilitated by counsel's responses to my preliminary rulings.

---

[5] In this respect he is correct.

Discussion

    A.   Attorney-Client Privilege and Work Product Doctrine

    Traditionally, the attorney-client privilege applies:

> "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived."

United States v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO, 119 F.3d 210, 214 (2d Cir. 1997) (quoting In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d 1032, 1036 (2d Cir. 1984)); accord United States v. Daugerdas, 757 F. Supp. 2d 364, 369 (S.D.N.Y. 2010); Amnesty International USA v. C.I.A., 728 F. Supp. 2d 479, 518-19 (S.D.N.Y. 2010); see also Kingsway Financial Services, Inc. v. Pricewaterhouse-Coopers LLP, No. 03 Civ. 5560, 2007 WL 473726, at *7 (S.D.N.Y. Feb. 14, 2007); In re Rivastigmine Patent Litigation, 237 F.R.D. 69, 73-74 (S.D.N.Y. 2006).[6]   The party invoking the privilege bears the burden of "establish[ing]

---

    [6] The test is sometimes truncated to three elements such that the party invoking the privilege must show "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice."   In re County of Erie, 473 F.3d 413, 419 (2d Cir. 2007) (citing United States v. Construction Products Research, Inc., 73 F.3d 464, 473 (2d Cir. 1997)).

those facts that are the essential elements of the privileged relationship, a burden not discharged by mere conclusory or ipse dixit assertions." In re Grand Jury Subpoena Dated Jan. 4, 1984, 750 F.2d 223, 224-25 (2d Cir. 1984) (internal quotation marks and citations omitted); accord William A. Gross Construction Associates, Inc. v. American Manufacturers Mutual Insurance Co., 262 F.R.D. 354, 360-61 (S.D.N.Y. 2009).

The work product doctrine, codified in part by Rule 26(b)(3) of the Federal Rules of Civil Procedure, "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting Hickman v. Taylor, 329 U.S. 495, 510-11 (1947)); accord Gruss v. Zwirn, No. 09 Civ. 6441, 2011 WL 2946376, at *6 (S.D.N.Y. July 14, 2011); see also In re Steinhardt Partners, L.P., 9 F.3d 230, 234 (2d Cir. 1993) ("The logic behind the work product doctrine is that opposing counsel should not enjoy free access to an attorney's thought processes."). To warrant protection, a document or communication must have been prepared in anticipation of litigation by or for a party, or by his representative. Gruss, 2011 WL 2946376, at *7; Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466, 474 (S.D.N.Y. 2003). The party resisting disclosure carries

"the heavy burden of establishing its applicability." <u>In re Grand Jury Subpoena Dated July 6, 2005</u>, 510 F.3d 180, 183 (2d Cir. 2007).

    B.   <u>The "Claw Back" Documents</u>

    As discussed above, the Kohn Respondents seek to remove from their privilege logs 78 documents that are allegedly communications between them and the law firms of Conrad, O'Brien, Gellman & Rohn, PC ("Conrad O'Brien"), their litigation counsel in this case, and Susman Godfrey LLP, their litigation counsel "in a potential action against Steven Donziger or his firms." (Hamill Letter at 2 & n.1). The Kohn Respondents maintain that these documents are not responsive to the subpoenas served on them. (Hamill Letter at 2). Chevron agrees that any documents reflecting the Kohn Respondents' "communications with counsel" are likely privileged and not responsive to the subpoenas. (Mastro Letter at 2 n.1). Chevron has already consented to the Kohn Respondents' withholding 59 of these documents but requests that I conduct an <u>in camera</u> review of the remaining 19 to determine whether they are, in fact, responsive to the subpoenas. (Mastro Letter at 1-2).

    Having reviewed the 19 documents, I am satisfied that they reflect communications between the Kohn respondents and Conrad O'Brien. Therefore, they are not within the scope of the subpoenas and need not be produced to Chevron.

C.    Waiver

Chevron claims that any privileges the Respondents seek to protect here have already been waived by order of Judge Kaplan. Specifically, they argue that Judge Kaplan's orders of October 20, 2010 and November 30, 2010 -- which held that any privilege asserted by Mr. Donziger on behalf of the LAPs in response to the subpoena served on him in the Section 1782 proceeding (the "Donziger subpoena") had been waived by his failure to produce a timely privilege log (the "Donziger waiver") -- also waived any privilege the Respondents might otherwise assert here on behalf of the LAPs.   (Memorandum of Law in Support of Chevron's Motion to Compel the Production of Documents from Third-Parties Laura J. Garr and Andrew Woods ("Pl. Garr/Woods Memo.") at 7-8; Memorandum of Law in Support of Chevron Corporation's Motion to Compel Production of Documents from Joseph C. Kohn and Kohn, Swift & Graf P.C. ("Pl. Kohn Memo.") at 5-7); Chevron 11/30/10 Opinion, 749 F. Supp. 2d at 176-79, 185.  To address this claim, I will first consider whether the Donziger waiver is applicable here and then construe its scope.

1.    Transferability of Waiver

The Donziger subpoena, which Chevron served on August 9, 2010, sought various categories of documents and communications that had been created, received, or conveyed by Mr. Donziger, anyone "acting in [his] interest or on [his] instructions or assisting [him],

14

including . . . [his] agents, servants, and representatives," or "any lawyer, attorney or counselor, or [person] acting on their behalf or assisting them, that has at any time represented or advised [the LAPs] . . . , or having a financial interest of any kind in the [Lago Agrio litigation] or the [Section 1782 proceeding]." (Subpoena to Steven Robert Donziger ("Donziger Subpoena"), attached as Exh. 1 to Proof of Service of Subpoena dated Aug. 9, 2010 in No. 10 MC 2, at 9-10, 13, 15-23). Its return date was August 18, 2010. (Donziger Subpoena). Mr. Donziger filed a motion to quash the subpoena on August 27, 2010, arguing in part that numerous responsive documents were covered by the attorney-client privilege and the work product doctrine. (Steven R. Donziger's Memorandum of Law in Support of His Motion to Quash or Modify Subpoenas at 13-16, No. 10 MC 2). On October 20, 2010, Judge Kaplan found that those privileges had been waived by Mr. Donziger's failure to file a timely privilege log pursuant to Rule 26(b)(5) of the Federal Rules of Civil Procedure and Local Civil Rule 26.2 of the Southern and Eastern Districts of New York. Chevron 10/20/10 Opinion, 749 F. Supp. 2d at 140. Judge Kaplan noted that he might reconsider this finding if Mr. Donziger submitted "a complete privilege log on or before October 29, 2010." Id. at 140 n.17. Mr. Donziger failed to meet that deadline, although he did submit "a purported privilege log -- which is over

15

2,000 pages long and claims privilege as to 8,652 documents" on November 15, 2010. Chevron 11/30/10 Opinion, 749 F. Supp. 2d at 173. Judge Kaplan found this submission insufficient to warrant revisiting his earlier order and, on November 30, 2010, confirmed that Mr. Donziger had forfeited his right to assert any privileges on behalf of the LAPs in opposing the Donziger subpoena. Id. at 176-85.

The Respondents and the LAPs argue that this waiver does not vitiate any of the privileges they seek to assert in this proceeding because (1) it was imposed in a different proceeding under different circumstances and (2) it was compelled, not voluntary. (Third-Parties Andrew Woods' and Laura J. Garr's Corrected Memorandum of Law in Opposition to Chevron Corporation's Motion to Compel the Production of Documents ("Garr/Woods Resp. Opp. Memo.") at 5-8; [Corrected] Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje's Memorandum of Law in Opposition to Chevron Corporation's Motion to Compel the Production of Privileged Documents from Laura J. Garr and Andrew Woods ("Def. Garr/Woods Opp. Memo.") at 5-6; Memorandum of Law of Defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje in Opposition to Chevron Corporation's Motion to Compel Documents from Joseph C. Kohn and Kohn, Swift & Graf P.C. ("Def. Kohn Opp. Memo.") at 7-11). Chevron disagrees, arguing that (1) the Donziger waiver applies

16

here notwithstanding the fact that this proceeding is distinct from the one in which it was imposed and (2) the Donziger waiver was not compelled because it resulted from Mr. Donziger's intentional behavior and because Mr. Donziger voluntarily withdrew his objections to it.  (Reply Memorandum of Law in Further Support of Chevron Corporation's Motion to Compel the Production of Documents from Third-Parties Laura J. Garr and Andrew Woods ("Pl. Garr/Woods Reply Memo.") at 3-5; Chevron Corporation's Reply Memorandum of Law in Further Support of Its Motion to Compel Documents from Joseph C. Kohn and Kohn, Swift & Graf P.C. ("Pl. Kohn Reply Memo.") at 3-5).

Where a party voluntarily discloses privileged documents to an adversary in one proceeding, it cannot withhold the same documents on the basis of privilege in a subsequent proceeding, even if that subsequent proceeding involves a different adversary.  See In re Steinhardt Partners, 9 F.3d at 235 ("The waiver doctrine provides that voluntary disclosure of work product to an adversary waives the privilege as to other parties [in a subsequent proceeding]."); Urban Box Office Network, Inc. v. Interfase Managers, L.P., No. 01 Civ. 8854, 2004 WL 2375819, at *3-4 (S.D.N.Y. Oct. 21, 2004) (applying same principle to waive attorney-client privilege). Moreover, where a party "voluntarily undertakes actions that will predictably lead to the disclosure of [a] document, then waiver will follow."  Rattner v. Netburn, No. 88 Civ. 2080, 1989 WL

17

223059, at *9 (S.D.N.Y. June 20, 1989), aff'd, 1989 WL 231310 (S.D.N.Y. Aug. 23, 1989); see also Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D. 465, 480 (S.D.N.Y. 1993) ("[T]he intent of the party and its attorney not to cause an implied waiver is immaterial if they intentionally undertake actions that have the effect of causing such a waiver."); cf. Urban Box Office, 2004 WL 2375819, at *3 ("A party which seeks to uphold the privilege must take affirmative measures to maintain the confidentiality of attorney-client communications."). In contrast, where a party does not have the opportunity to assert a privilege before production of the corresponding document is compelled, the privilege is not waived. See Transamerica Computer Co. v. International Business Machines Corp., 573 F.2d 646, 648, 651-53 (9th Cir. 1978) (finding no waiver for privileged documents defendant accidentally produced while complying with court-ordered turnover of 17 million pages within three-month period where district judge had held that "the timetable he himself had imposed was so stringent that, as a practical matter, it effectively denied [producing party] the opportunity to claim the attorney-client privilege"); In re Parmalat Securities Litigation, No. 04 MD 1653, 2006 WL 3592936, at *4 (S.D.N.Y. Dec. 1, 2006) (finding no waiver of privilege where documents were seized before privilege holder had opportunity to assert privilege).

This case lies somewhere between these guideposts.  Mr. Donziger did not volunteer to disclose privileged documents in response to the Donziger subpoena, but he also was not deprived of the opportunity to assert his objections due to the sort of circumstances presented in Transamerica or Parmalat.[7]  Chevron 11/30/10 Opinion, 749 F. Supp. 2d at 173, 182 (noting that Mr. Donziger was on notice of his obligation to produce a privilege log by, at the latest, September 1, 2010 but did not produce one until November 15, 2010).  Where an attorney is precluded from asserting privileges on behalf of his client due to his failure to produce a privilege log, courts in other circuits have characterized the resulting waiver as "implied," Precision Airmotive Corp. v. Ryan Insurance Services, Inc., No. 2:10-mc-244, 2011 WL 148818, at *6 (D. Me. Jan. 17, 2011), and not "accidental or inadvertent," Mansourian v. Board of Regents of University of California at Davis, No. S-03-2591, 2007 WL 4170819, at *2 (E.D. Cal. Nov. 19,

---

[7] Chevron's argument that Mr. Donziger consented to the waiver by voluntarily withdrawing his opposition to it is disingenuous. (Pl. Garr/Woods Reply Memo. at 4).  Unlike Westinghouse Electric Corp. v. Republic of the Philippines, 951 F.2d 1414 (3d Cir. 1991), the case Chevron cites, Mr. Donziger did not withdraw his objection to waiver of the privilege; rather, he withdrew his motion for reconsideration of one of Judge Kaplan's orders so that he could immediately proceed with his appeal of that order to the Second Circuit.  Chevron 11/30/10 Opinion, 740 F. Supp. at 175.  Although Mr. Donziger was unsuccessful in the Circuit, see Lago Agrio Plaintiffs v. Chevron Corp., 409 Fed. Appx. 393 (2d Cir. 2010), he at no point consented to Judge Kaplan's finding of waiver.

2007).

Here, Judge Kaplan explicitly found that Mr. Donziger's behavior in failing to produce a privilege log was intentional:

> This Court is satisfied [] that the [tardy production of Mr. Donziger's privilege log] was not simply a consequence of errors made and positions taken for benign reasons. The Court finds and concludes that they have intended, at least since September 1, to achieve that tactical advantage at their adversaries' expense. . . . This Court finds that the failure to submit a privilege log, at least from September 1, 2010, . . . was a deliberate attempt to structure the response to the subpoenas in a way that would create the maximum possibility for delay.

Chevron 11/30/10 Opinion, 749 F. Supp. 2d at 184, 185.  While the result might be different absent this finding, where intentional conduct leads to a sanction in the form of an implied waiver, that waiver carries over to a related case, see In re Steinhardt Partners, 9 F.3d at 235; Urban Box Office, 2004 WL 2375819, at *3-4, and a fortiori, it carries over to a related case involving the same parties.  Thus, any document within the scope of the Donziger waiver is stripped of its privileges for the purposes of this action.

   2.   Scope of Waiver

Subpoenas issued pursuant to Rule 45 of the Federal Rules of Civil Procedure may require respondents to "produce designated documents, electronically stored information, or tangible things in that person's possession, custody, or control."  Fed. R. Civ. P.

45(a)(1)(A)(iii); see also Linde v. Arab Bank, PLC, 262 F.R.D. 136, 141 (E.D.N.Y. 2009). "Control" is construed broadly to encompass documents that the respondent has "the legal right, authority, or practical ability to obtain . . . upon demand." Dietrich v. Bauer, No. 95 Civ. 7051, 2000 WL 1171132, at *3 (S.D.N.Y. Aug. 16, 2000), adhered to on reconsideration, 198 F.R.D. 397 (S.D.N.Y. 2001); accord In re NTL, Inc. Securities Litigation, 244 F.R.D. 179, 195 (S.D.N.Y. 2007), aff'd sub nom. Gordon Partners v. Blumenthal, No. 02 Civ. 7377, 2007 WL 1518632 (S.D.N.Y. May 17, 2007); Export-Import Bank of the United States v. Asia Pulp & Paper Co., 233 F.R.D. 338, 341 (S.D.N.Y. 2005); see also Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d 130, 138 (2d Cir. 2007) ("[I]f a party has access and the practical ability to possess documents not available to the party seeking them, production may be required.").[8]  Thus, "'[t]he test for the production of documents

---

[8] Many cases define the term "control" as it pertains to Rule 34(a)(1) of the Federal Rules of Civil Procedure.  However, the phrase "possession, custody or control" carries the same meaning under both Rules.  See Atwell v. City of New York, No. 07 Civ. 2365, 2008 WL 5336690, at *1 (S.D.N.Y. Dec. 15, 2008) ("Rule 45 requests for production are subject to the limits on discovery under Rules 26 and 34."); United States v. Stein, 488 F. Supp. 2d 350, 360-61 (S.D.N.Y. 2007) (noting phrase "possession, custody or control" appears in Rule 16 of the Federal Rules of Criminal Procedure and Rules 34 and 45 of the Federal Rules of Civil Procedure and finding "no hint in the history of these rules that the meaning of the phrase differs depending upon which rule is in question"); Dietrich, 2000 WL 1171132, at *2 n.2 ("[T]he scope of discovery, and the meaning of 'control,' under [Rules 34 and 45] is

is control, not location,'" <u>In re Flag Telecom Holdings, Ltd.</u>
<u>Securities Litigation</u>, 236 F.R.D. 177, 180 (S.D.N.Y. 2006) (quoting
<u>Marc Rich & Co., A.G. v. United States</u>, 707 F.2d 663, 667 (2d Cir.
1983)), and the respondent may be required to produce materials
that are not in its physical possession, <u>Leser v. U.S. Bank</u>
<u>National Association</u>, No. 09 CV 2362, 2010 WL 1945806, at *1
(E.D.N.Y. May 13, 2010) ("[T]he Federal Rules of Civil Procedure
require parties to produce items in their 'possession, custody, and
control,' not simply those in their immediate possession.");
<u>Securities and Exchange Commission v. Strauss</u>, No. 09 Civ. 4150,
2009 WL 3459204, at *7 (S.D.N.Y. Oct. 28, 2009) ("'Control' is
construed broadly and may cover materials that are not in a party's
actual physical possession."). Where the respondent contests its
ability to produce a document, "[t]he party seeking the production
bears the burden of demonstrating that the other party has control
over the documents sought." <u>In re Flag Telecom Holdings, Ltd.</u>, 236
F.R.D. at 180.

  Chevron maintains that all of the documents on the
Respondents' privilege logs fall within the subject matter areas
identified in the Donziger subpoena. (Pl. Garr/Woods Memo. at 6-7;
Pl. Kohn Reply Memo. at 1). Moreover, it argues that these

———————————

coextensive at least with respect to documentary discovery.").

documents were within Mr. Donziger's possession, custody, or
control due to his relationship with the Respondents and,
therefore, that they were within the scope of the Donziger
subpoena. (Pl. Garr/Woods Memo. at 7-8; Pl. Kohn Memo. at 5-7).
As a result, it concludes that all of these documents were subject
to the Donziger waiver. (Pl. Garr/Woods Memo. at 7-8; Pl. Kohn
Memo. at 5-7). The Respondents assert that some number of the
documents on their respective privilege logs do not fall within the
scope of the Donziger subpoena -- either because the documents were
not within the categories sought by the Donziger subpoena or
because they were not within the possession, custody, or control of
Mr. Donziger -- and therefore that the LAPs' privileges have not
been waived with respect to those documents. (Tr. at 17, 23-25;
Hamill Letter at 1). I will address the claims of each Respondent,
and those of the LAPs, in turn.

            a.   Ms. Garr

     Ms. Garr identifies only one category of documents on her
privilege log that falls within the scope of the subpoena served on
her but outside the scope of the Donziger subpoena -- specifically,
she maintains that e-mails contained within her "personal Gmail
account" are not responsive to the Donziger subpoena because they
were not within Mr. Donziger's possession, custody, or control.
(Tr. at 17, 24-25). Chevron disputes this characterization,

claiming that Ms. Garr was effectively Mr. Donziger's employee and, therefore, that any documents responsive to the Donziger subpoena that are in her possession are also within his control.   (Tr. at 39; Pl. Garr/Woods Memo. at 4-6).

Ms. Garr worked intermittently with Mr. Donziger from the spring of 2007 until October of 2010.   During three distinct periods -- May 2007 through August 2007, January 2009 through April 2009, and August 2009 through August 2010 -- she volunteered as a legal intern[9] with the Amazon Defense Coalition and Selva Viva Selviva Cia, Ltda., working exclusively on the Lago Agrio litigation.   (Garr Decl., ¶¶ 2-4; Tr. at 45-52).   From August 2010 through October 2010, she continued to work on that litigation as "a temporary, contract associate attorney for Steven Donziger," during which time she was paid by Mr. Donziger.   (Garr Decl., ¶ 5; Tr. at 50, 51-52).   Throughout this entire period, Ms. Garr "worked with and under the supervision of Steven Donziger," as well as others involved in the Lago Agrio litigation.   (Garr Decl., ¶¶ 2-4; Tr. at 47-48, 50).   Although she spent the summer of 2007 working in Ecuador, she was in the United States and Ecuador during the

---

[9] Ms. Garr variously refers to her position as "intern" and "extern."   (Declaration of Laura J. Garr dated June 16, 2011 ("Garr Decl."), ¶¶ 2-4).   However, she has not asserted that there is any distinction between these two roles, and she appears to have performed the same tasks while in each.   (Garr Decl., ¶¶ 2-4).

spring of 2009, and she worked mostly "out of Steven Donziger's kitchen" from August 2009 through October 2010. (Tr. at 46-47, 51).

Despite working so closely with Mr. Donziger, Ms. Garr maintains that the contents of her Gmail account were not within the scope of the Donziger subpoena because Mr. Donziger did not have "custody or control or access to her Gmail account." (Tr. at 25). Aside from the period during which she was an employee of Mr. Donziger, however, Ms. Garr did not maintain a dedicated work e-mail address, and thus she sent and received e-mails related to the Lago Agrio litigation from her Gmail account. (Tr. at 25; E-mail from sdonziger@gmail.com to lauragarr@gmail.com dated Feb. 9, 2009, attached as Exh. 14 to Hendricks 6/10/11 Decl.; E-mail from lauragarr@gmail.com to Andrew Woods dated Sept. 11, 2009, attached as Exh. 17 to Hendricks 6/10/11 Decl.). Courts have repeatedly found that employers have control over their employees and can be required to produce documents in their employees' possession. See, e.g., Caston v. Hoaglin, No. 2:08-CV-200, 2009 WL 1687927, at *3 (S.D. Ohio June 12, 2009) (finding employer "has control over its current employees and the records within their possession" (citing In re Grand Jury Subpoenas Duces Tecum Dated June 13, 1983 and June 22, 1983, 722 F.2d 981, 984 (2d Cir. 1983))); Miniace v. Pacific Martime Association, No. C 04-03506, 2006 WL 335389, at *2 (N.D.

25

Cal. Feb. 13, 2006) ("Numerous courts have found that corporations have control over their officers and employees and that corporations may be required to produce documents in their possession." (citing Herbst v. Able, 63 F.R.D. 135, 138 (S.D.N.Y. 1972) and Riddell Sports, Inc. v. Brooks, 158 F.R.D. 555, 558-59 (S.D.N.Y. 1994))); Schaaf v. SmithKline Beecham Corp., 233 F.R.D. 451, 455 (E.D.N.C. 2005) (finding employer had control over employee's work-related documents, whether located at office or in her home (citing In re Grand Jury Subpoenas, 722 F.2d at 984)). Indeed, the subject of a subpoena is expected to seek documents even from former employees. See 8B Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, Federal Practice and Procedure § 2210; Export-Import Bank of the United States, 233 F.R.D. at 341 ("[C]ourts insist that corporations, at the very least, ask their former employees to cooperate before asserting that they have no control over documents in the former employees' possession."). Ms. Garr admits that she would have turned over any responsive e-mails from her Gmail account to Mr. Donziger had he asked for them and had she been advised by counsel that compliance was appropriate. (Tr. at 57). There is thus no evidence that she was "'unwilling or unable'" to provide Mr. Donziger with the relevant contents of her Gmail account or that Mr. Donziger lacked the practical ability to acquire it from her despite its being

located in her private e-mail account rather than on his law firm's server.  8B Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, <u>Federal Practice and Procedure</u> § 2210 (quoting <u>In re Folding Carton Antitrust Litigation</u>, 76 F.R.D. 420, 423 (N.D. Ill. 1977)).  Any responsive e-mails from Ms. Garr's Gmail account therefore fall within the scope of the Donziger subpoena and are subject to the Donziger waiver.

> b.   <u>Mr. Woods</u>

Unlike Ms. Garr, Mr. Woods admits that any documents in his possession that fall within the subject matter of the Donziger subpoena are also within Mr. Donziger's possession, custody, and control.  (Tr. at 16-17, 24).  However, he disputes that any such documents created after September 29 or 30, 2010 -- the dates on which his computer hard drives were imaged for production in response to the Donziger subpoena -- are within the scope of the Donziger subpoena.  (Declaration of Andrew Woods dated June 16, 2011, ¶ 4; Tr. at 17, 29).  The LAPs similarly argue that any documents created by Mr. Woods after October 29, 2010 -- the final deadline Judge Kaplan had set for Mr. Donziger to submit a privilege log in the Section 1782 proceeding -- are outside the scope of the Donziger subpoena and thus also outside the scope of the Donziger waiver.  (Def. Garr/Woods Opp. Memo. at 6; Defendants Hugo Gerardo Camacho Naranjo's and Javier Piaguaje Payaguaje's

27

Response to This Court's July 19, 2011 Ruling and Directives ("Def. 7/22/11 Memo.") at 2); Chevron 10/20/10 Opinion, 749 F. Supp. 2d at 140 n.17.  Chevron argues that the Donziger waiver applies to all documents in Mr. Woods' possession that fall within the subject areas sought by the Donziger subpoena, regardless of when those documents were created.  (Tr. at 38; Pl. Garr/Woods Memo. at 7-8 & n.4).  In the alternative, Chevron has suggested that the scope of the Donziger waiver includes all responsive documents produced through February 1, 2011; it bases this position on an order issued by Max Gitter, the special master appointed by Judge Kaplan to oversee Mr. Donziger's deposition, that Mr. Donziger produce his hard drives on that date in order to comply fully with the Donziger subpoena.  (Tr. at 38-39).

Rule 26(e) of the Federal Rules of Civil Procedure grants a court the power to order a respondent to "supplement or correct its disclosure or response" to a subpoena.  Fed. R. Civ. P. 26(e)(1)(B).  This includes the authority to order a respondent to produce materials created after the return date of the subpoena.  See, e.g., United States v. International Business Machines Corp., 83 F.R.D. 92, 96 (S.D.N.Y. 1979) (requiring respondent to produce "[r]esponsive documents created after the return date of the subpoena" because such documents were relevant to purpose of subpoena).  The Donziger subpoena did not limit the scope of the

documents it sought based on when they were created, and Judge
Kaplan did not identify a date after which newly-created responsive
materials would not have to be produced.   (Donziger Subpoena).
Moreover, Mr. Donziger included documents that had been produced
months after the return date of the subpoena in his own privilege
log, which was submitted on November 15, 2010.   Chevron 11/30/10
Opinion, 749 F. Supp. 2d at 173.   Thus, it seems clear that the
Donziger subpoena sought responsive documents created after its
return date.   Yet the scope of the Donziger subpoena is not
coextensive with the scope of the Donziger waiver.   That waiver was
imposed on October 20, 2010 as a penalty for Mr. Donziger's
violation of the rules of discovery.   Chevron 10/20/10 Opinion, 749
F. Supp. 2d at 140; Chevron 11/30/10 Opinion, 749 F. Supp. 2d at
176 (explaining how Mr. Donziger's failure to produce timely
privilege log in violation of procedural rules and court orders led
to waiver).   It is therefore conceptually distinct from the broad
subject matter waiver that can result where a party places the
substance of its privileged communications at issue in a
litigation.   E.g., In re Grand Jury Proceedings, 219 F.3d 175, 182
(2d Cir. 2000) ("[F]airness considerations arise when the party
attempts to use the privilege both as 'a shield and a sword.'
. . .   [A] party cannot partially disclose privileged
communications or affirmatively rely on privileged communications

29

to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party."). Moreover, concern over prejudice to Chevron was not the animating factor behind Judge Kaplan's imposition of the Donziger waiver, and Chevron has not alleged that it would suffer prejudice should that waiver be limited to documents in existence at the time it was imposed. Id. at 188 ("[I]f the court finds that the privilege was waived, then the waiver should be tailored to remedy the prejudice."). Finally, Mr. Gitter's determination is not binding in this proceeding, especially in the absence of any information regarding the basis for his conclusion. See In re Continental Vending Machine Corp., 543 F.2d 986, 995 (2d Cir. 1976) ("[A special] master's findings are not binding on review unless supported by substantial evidence."); In re Austrian and German Bank Holocaust Litigation, No. 98 Civ. 3938, 2001 WL 228107, at *5 (S.D.N.Y. March 8, 2001) ("A special master's conclusions of law, [] or conclusions on mixed questions of law and fact, are not entitled to any special deference and are subject to de novo review."). There is thus no justification for interpreting the Donziger waiver to encompass documents that did not exist at the time it was imposed. Any privileged documents responsive to the Donziger subpoena that were created after October 20, 2010 do not

fall within the Donziger waiver.[10]

           c.    <u>The Kohn Respondents</u>

The Kohn Respondents admit that all of the documents on their privilege log are within the subject matter sought by the Donziger subpoena. (Hamill Letter at 2). Nevertheless, they argue that these documents are not within the scope of the Donziger subpoena because they were not in the possession, custody, or control of Mr. Donziger. (Hamill Letter at 1).

Because it is rare that documents in an attorney's possession arising out of a representation are subject to subpoena, I have been unable to identify any case law illuminating the "possession, custody or control" standard in that situation. Nevertheless, principles regarding this standard that arise in the context of corporate relationships are conceptually applicable and will provide guidance here. In particular,

> [c]ourts have found control by a parent corporation over documents held by its subsidiary, by a subsidiary corporation over documents held by its parent, and by one sister corporation over documents held by another sister corporation . . . . One of the circumstances which warrants a finding of control is where [one] corporate entity has the ability in the ordinary course of business to obtain documents held by [the other] corporate entity.

<u>Securities and Exchange Commission v. Credit Bancorp, Ltd.</u>, 194

---

      [10] This date is germane only to Mr. Woods. Neither Ms. Garr nor the Kohn Respondents have identified any responsive documents created after that date that are within their possession.

F.R.D. 469, 472 (S.D.N.Y. 2000) (internal citations omitted).

It is undisputed that Mr. Kohn and Mr. Donziger worked together for many years on litigation involving the LAPs. (Excerpts from the Deposition of Steven Donziger ("Donziger Dep."), attached as Exh. 4 to Champion 6/15/11 Decl., at 610). The Kohn Respondents provided funding for Mr. Donziger's work on the Lago Agrio litigation (e.g., Letter of Joseph C. Kohn dated Oct. 18, 2007 and attachments, attached as Exh. 25 to Champion 6/15/11 Decl.; E-mail chain dated Aug. 14, 2007, attached as Exh. 29 to Champion 6/15/11 Decl.), and Mr. Donziger was their primary source of "information about the lawsuit and legal strategy" (Donziger Dep. at 3546-49). The two men also co-signed at least one contract and regularly exchanged documents through e-mail. (Agreement dated Jan. 2, 2006, attached as Exh. 5 to Champion 6/15/11 Decl.; E-mail chain dated Aug. 20, 2007, attached as Exh. 10 to Champion 6/15/11 Decl.; E-mail of Richard Kamp dated May 12, 2007, attached as Exh. 17 to Champion 6/15/11 Decl.; E-mail of Steven Donziger dated May 16, 2007, attached as Exh. 19 to Champion 6/15/11 Decl.). Thus, there is sufficient documentary evidence to establish that Mr. Donziger had the practical ability to obtain documents related to the Lago Agrio litigation from the Kohn Respondents, and any such documents that are responsive to the Donziger subpoena therefore also fall within the Donziger waiver.

      d.   <u>The LAPs</u>

The LAPs make one further argument regarding the scope of the Donziger subpoena.  Relying on distinctions between the language of the Donziger subpoena and the language of the subpoenas served on the Respondents, they argue that there must be some privileged documents that fall within the latter but outside of the former. (Def. 7/22/11 Memo. at 2-3).  However, the Respondents have not indicated that there actually are any privileged documents that fall into these alleged gaps.  Because the LAPs have failed to identify any specific documents from the Respondents' privilege logs that do not fall within the subject matter descriptions contained in the Donziger subpoena but are within the document categories sought by the subpoenas served on the Respondents, I have no basis for concluding that such documents exist.

The Donziger waiver therefore applies to every document on Ms. Garr's privilege log and on the Kohn Respondents' privilege logs. With respect to Mr. Woods' privilege log, the privilege has been waived for any documents created prior to October 20, 2010; documents created after that date are not subject to the Donziger waiver.  Therefore, I must determine whether those documents fall within the crime-fraud exception.

    D.   <u>Crime-Fraud Exception</u>

Chevron argues that any privilege Mr. Woods may have asserted

has been vitiated by the crime-fraud exception because the Lago Agrio litigation was conducted pursuant to a "fraudulent scheme." (Pl. Garr/Woods Memo. at 11-12; Pl. Kohn Memo. at 1, 17-22).

      1.   Legal Standard

"The crime-fraud exception removes the privilege from those attorney-client communications that are 'relate[d] to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct.'" United States v. Jacobs, 117 F.3d 82, 87 (2d Cir. 1997) (alteration in original) (quoting In re John Doe, Inc., 13 F.3d 633, 636 (2d Cir. 1994)). The exception also abrogates the work product doctrine. See In re Richard Roe, Inc., 168 F.3d 69, 71-72 (2d Cir. 1999). For the crime-fraud exception to apply, there must be "'probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the crime or fraud.'" In re Omnicom Group, Inc. Securities Litigation, 233 F.R.D. 400, 404 (S.D.N.Y. 2006) (quoting Jacobs, 117 F.3d at 87). The burden of demonstrating probable cause rests on the party invoking the exception. Id.

The probable cause standard in this context is "not an overly demanding" one. A.I.A. Holdings, S.A. v. Lehman Brothers, Inc., No. 97 Civ. 4978, 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999). However, it "is not satisfied by a showing that the material in question 'might provide evidence of a crime or fraud.'" In re

34

Fresh Del Monte Pineapple, No. 04 MD 1628, 2007 WL 64189, at *3 (S.D.N.Y. Jan. 4, 2007) (quoting In re Richard Roe, Inc., 168 F.3d at 71), aff'd sub nom. American Banana Co. v. J. Bonafede Co., 407 Fed. Appx. 520 (2d Cir. 2010). Rather, the evidence provided must give "'a prudent person [] a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof.'" Id. (quoting In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d at 1039). "'The crime or fraud need not have occurred for the exception to be applicable; it need only have been the objective of the [] communication.'" Id. at *14 n.15 (quoting In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d at 1039).

Generally, in determining whether the crime-fraud exception applies, "the pertinent intent is that of the client, not the attorney."[11] In re Omnicom Group, 233 F.R.D. at 404. However, even

---

[11] Indeed, in the typical case, the crime-fraud exception may apply even if the attorney is totally unaware of participating in a crime or fraud. United States v. Kerik, 531 F. Supp. 2d 610, 617 (S.D.N.Y. 2008). The Respondents are all at pains to demonstrate that, to the extent any crime or fraud exists in this case, they were not aware of it. (Tr. at 96-97, 122; Garr/Woods Resp. Opp. Memo. at 13-14; Kohn, Swift & Graf P.C. and Joseph C. Kohn's Memorandum of Law in Opposition to Chevron Corporation's Motion to Compel Production of Documents ("Kohn Resp. Opp. Memo.") at 8-16). Chevron did not produce persuasive evidence of such knowledge, but it was not obliged to.

though the privilege belongs to the client, it may be pierced by wrongdoing of the attorney, even without the knowledge or intent of the client.  See United States v. Kaplan, No. 02 Cr. 883, 2003 WL 22880914, at *6-9 (S.D.N.Y. Dec. 5, 2003) (applying crime-fraud exception where defendant law firm was accused of insurance fraud); United States v. Rivera, 837 F. Supp. 565, 569 (S.D.N.Y. 1993) (applying crime-fraud exception where defendant law firm engaged in immigration fraud, though noting clients were likely aware of the fraud); United States v. $1.5 Million Letter of Credit as a Substitute Res for Seized Bank Accounts, No. 90 Civ. 4450, 1992 WL 204357, at *5 (S.D.N.Y. Aug. 7, 1992) (finding that "the government is not precluded from relying on the crime/fraud exception by the mere fact" that lawyer is accused of fraud rather than client); Duttle v. Bandler & Kass, 127 F.R.D. 46, 56 (S.D.N.Y. 1989) ("[L]egal advice that furthers a fraudulent goal is not privileged, regardless of the innocence of the client seeking the advice."); see also In re Impounded Case (Law Firm), 879 F.2d 1211, 1213 (3d Cir. 1989) (noting "[w]e cannot agree" that "the crime-fraud exception does not apply to defeat the client's privilege where the pertinent alleged criminality is solely that of the law firm"); cf. In re Sealed Case, 107 F.3d 46, 49 n.2 (D.C. Cir. 1997) ("In nearly all cases, a client's innocence will bar application of the crime-fraud exception.  We say 'nearly all' because there may be rare

36

cases . . . in which the attorney's fraudulent or criminal intent defeats a claim of privilege even if the client is innocent."); State Farm Mutual Automobile Insurance Co. v. Hawkins, No. 08-10367, 2011 WL 595810, at *5 (E.D. Mich. Feb. 10, 2011) (finding that an attorney's "allegedly improper conduct may allow the piercing of this privilege, but not where the only defendant is the client, and where the only relevant material, and therefore the only discoverable material, would be material that inculpates her"); but see In re Grand Jury Proceedings, 417 F.3d 18, 23 (1st Cir. 2005) ("The crime-fraud exception requires the client's engagement in criminal or fraudulent activity and the client's intent with respect to attorney-client communications.").

In this case, although the LAPs oppose the application of the crime-fraud exception in part by attempting to rebut allegations that they themselves were "engaged in a fraudulent effort" (Def. Kohn Opp. Memo. at 20-21), Chevron alleges wrongdoing by the LAPs as well as by their attorneys (Pl. Garr/Woods Memo. at 11-12; Pl. Kohn Memo. at 18-20). Wrongdoing by either group is sufficient for the exception to apply.

> 2. Choice of Law

Case law on the crime-fraud exception does not make perfectly clear what wrongdoing must be alleged, and with what specificity, in order for the privilege to apply. "[T]he actual burden to be

imposed on a movant seeking to defeat a privilege in this way is still an open question." In re Omnicom Group, 233 F.R.D. at 406. "There is no question that the crime-fraud exception embraces common-law fraud . . . [and] there is a large body of caselaw that recognizes its applicability even to non-fraud intentional torts." Specialty Minerals, Inc. v. Pleuss-Stauffer AG, No. 98 Civ. 7775, 2004 WL 42280, at *9 (S.D.N.Y. Jan. 7, 2004) (internal citations omitted).  Indeed, some courts have interpreted the exception so broadly as to encompass "'misconduct fundamentally inconsistent with the basic premises of the adversary system,'" Madanes v. Madanes, 199 F.R.D. 135, 148-49 (S.D.N.Y. 2001) (quoting Coleman v. American Broadcasting Cos., 106 F.R.D. 201, 208 (D.D.C. 1985)), and I have previously held that "[a]t a minimum, [] the attorney-client privilege does not protect communications in furtherance of an intentional tort that undermines the adversary system itself," id. at 149.

The issue is particularly thorny in this case, however, because much of the alleged wrongdoing took place in Ecuador and was directed toward an Ecuadorian court.  In determining whether probable cause of a crime or fraud has been established, Chevron contends that New York law applies. (Tr. at 70).  Nonetheless, it points to evidence that the defendants in this action were concerned that their conduct with respect to the Lago Agrio

litigation violated Ecuadorian criminal law and contends that there is sufficient evidence of criminal or fraudulent activity under either country's law to merit application of the exception.  (Tr. at 62-63, 71-72).  In contrast, the Respondents contend that, although U.S. law applies with respect to the application of the privilege and the crime-fraud exception, the underlying wrongdoing must be a crime or fraud under Ecuadorian law for the exception to apply.  (Tr. at 111-13).

The relevant factors in this case indicate that New York law should determine whether probable cause has been established to believe a crime or fraud was committed or intended.  "Whether foreign law should play a role in defining the contours of the attorney-client privilege in any given case is a determination within the sound discretion of the court."  Madanes, 199 F.R.D. at 145 ("[I]t would be anomalous for the plaintiff and [her attorney] to engage in conduct that may violate American professional ethics, even if not Argentine ethical norms, and then seek to shield their communications on the basis of a privilege asserted in an American court.").  And, because "what constitutes a crime will vary from one jurisdiction to the next," the crime-fraud exception "is forum-specific."  Id. at 148.

In making their arguments with respect to the crime-fraud exception, all parties have cited to U.S. law.  (E.g., Pl.

Garr/Woods Memo. at 11-12; Pl. Kohn Memo. at 17-22; Def. Garr/Woods
Opp. Memo. at 12-15; Def. Kohn Opp. Memo. at 19-22; Resp.
Garr/Woods Opp. Memo. at 11-14; Resp. Kohn Opp. Memo. at 8-9); <u>see</u>
<u>In re Fresh Del Monte Pineapple</u>, 2007 WL 64189, at *13 n.14
("Implied acceptance of a forum's law is sufficient to establish
the law for application to substantive legal claims."); <u>see also</u>
<u>Kingsway Financial Services, Inc. v. Pricewaterhouse-Coopers LLP</u>,
No. 03 Civ. 5560, 2007 WL 1837133, at *2 (S.D.N.Y. June 27, 2007)
("[T]he law is clear in this Circuit that federal privilege law
should be applied to evidence relevant to both federal and state
law claims."); <u>cf.</u> <u>Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.</u>,
208 F.R.D. 92, 98 (S.D.N.Y. 2002) ("Where . . . alleged privileged
communications took place in a foreign country or involved foreign
attorneys or proceedings, this court defers to the law of the
country that has the 'predominant' or 'the most direct and
compelling interest' in whether those communications should remain
confidential, unless that foreign law is contrary to the public
policy of this forum.").

Further, although the wrongdoing alleged was largely directed
toward the court in Ecuador, the allegation in this portion of
Chevron's bifurcated case against the defendants is that the
judgment of the Ecuadorian court in the Lago Agrio litigation is
unenforceable "on, among others, grounds of fraud, failure to

Case 1:11-cv-03718-LAK-JCF   Document 180   Filed 08/03/11   Page 41 of 48

afford procedures compatible with due process, lack of impartial tribunals, and contravention of public policy." (11 Civ. 691, Complaint at 144-45 & ¶ 394). Analysis of such a claim requires "consideration of the fairness of a foreign adjudicating system," as well as a "case-specific inquiry" to identify fraud in procuring the judgment. Diorinou v. Mezitis, 237 F.3d 133, 143 (2d Cir. 2001). This analysis depends on U.S. law and public policy principles, since "comity prevails if [the] foreign judgment 'does not prejudice the rights of United States citizens or violate domestic public policy.'" Id. (quoting Victrix Steamship Co., S.A. v. Salen Dry Cargo A.B., 825 F.2d 709, 713 (2d Cir. 1987)).

Additionally, Judge Kaplan has already determined that Chevron's claim that the judgment of the Ecuadorian court in the Lago Agrio litigation is unenforceable will be determined using New York law. See Chevron Corp., 768 F. Supp. 2d at 632-33. Under New York law, a foreign judgment will not be recognized if, among other reasons, "the judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law," "the judgment was obtained by fraud," or "the cause of action on which the judgment is based is repugnant to the public policy of this state." N.Y. C.P.L.R. § 5304. In turn, a claim of fraud is established by showing "'a misrepresentation or a material omission of fact which was false

and known to be false by defendant,'" "'made for the purpose of inducing the other party to rely upon it,'" and causing "'justifiable reliance of the other party on the misrepresentation or material omission, and [] injury.'" Premium Mortgage Corp. v. Equifax, Inc., 583 F.3d 103, 108 (2d Cir. 2009) (quoting Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 80 (1996)).

Therefore, the crime-fraud exception to the privilege may apply here provided that there is a reasonable basis to suspect that the LAPs or their attorneys procured a judgment in Ecuador through fraud as defined by New York law, and that the documents they are seeking to protect were in furtherance of that fraud. To the extent that Ecuadorian law is relevant, it is relevant only to establish the parties' expectations with respect to the conduct of the Lago Agrio litigation -- in other words, whether or not the LAPs or their attorneys made misrepresentations that were justifiably relied upon by Chevron.[12]

---

[12] Both Chevron and the LAPs have incorporated by reference the arguments made in the Section 1782 proceeding with respect to the crime-fraud exception, which delve more deeply into Ecuadorian law. (Pl. Garr/Woods Memo. at 12 n.8; Def. Garr/Woods Opp. Memo. at 12 n.12). Chevron has also offered to make available expert reports it solicited in conjunction with other related actions discussing whether the wrongdoing alleged here was in violation of Ecuadorian law. (Tr. at 71). However, given the limited role that Ecuadorian law plays in this determination, particularly in light of Judge Kaplan's holding -- discussed below -- that a portion of the

3.   <u>Specific Frauds</u>

Chevron alleges three categories of wrongdoing with respect to the Lago Agrio litigation, which they contend merit the piercing of the attorney-client privilege: (1) using intimidation and illicit pressure to affect the Ecuadorian judges, (2) "hijacking" and "ghostwriting" ostensibly neutral expert reports, and (3) attempting to foment the criminal prosecution of Chevron's attorneys in Ecuador.  (Tr. at 65-66, 72-73).

As Chevron notes, Judge Kaplan has already "effectively found" a reasonable basis to suspect that the judgment in the Lago Agrio litigation was procured by fraud.  (Tr. at 61-62); <u>Chevron Corp.</u>, 768 F. Supp. 2d at 636-37 ("There is ample evidence of fraud in the Ecuadorian proceedings.").[13]  Especially given that the crime-fraud exception requires only a showing of probable cause that a crime or fraud was intended, this determination is sufficient for the crime-fraud exception to apply.

However, in so holding, Judge Kaplan identified three specific

wrongdoing alleged amounted to fraud under U.S. law, I need not consider those arguments or reports.

[13]  The LAPs argue that I should "[a]bstain" from deciding whether the Ecuadorian judgment was procured by fraud, since doing so would "'tilt the playing field of this lawsuit at a relatively early stage in the litigation.'"  (Def. Kohn Opp. Memo. at 25 (quoting <u>In re Omnicom Group</u>, 233 F.R.D. at 405-06); Def. Garr/Woods Opp. Memo. at 15 (same)).  Because Judge Kaplan has already made a determination on this issue, such caution is unnecessary.

examples of fraud: (1) forging a report submitted under the name of Dr. Calmbacher; (2) ghost-writing much or all of the expert report submitted by Mr. Cabrera; and (3) "undert[aking] a scheme to 'cleanse' the Cabrera report." Id. at 636.  The remainder of Chevron's allegations of wrongdoing are discussed only in the context of Judge Kaplan's determination that "Ecuador [d]oes [n]ot [p]rovide [i]mpartial [t]ribunals and [d]ue [p]rocess." Id. at 633-36.[14]  In making this determination, Judge Kaplan carefully considered the voluminous evidence propounded by Chevron and by the defendants.  Id. at 597-620, 625-26, 657-60.  Because Judge Kaplan went no further in determining whether Chevron has established a reasonable basis to suspect that any broader crime or fraud has been committed, I likewise decline to go further, particularly because the instant motion arises in the context of Chevron's more limited claim for declaratory relief from the Ecuadorian court's judgment.[15]  See id. at 638-39.

_____

[14] It is of note that this finding postdated the judgment in the Lago Agrio litigation, in which the Ecuadorian court considered allegations of fraud and determined that it would not rely on the Cabrera report in light of them.  Chevron Corp., 768 F. Supp. 2d at 636-37.  Judge Kaplan considered this but determined that "it likely is impossible to separate the tainted Cabrera process from the final judgment."  Id.

[15] Although Judge Kaplan alludes to the possibility that Chevron could establish that the defendants' tactics in Ecuador amounted to "duress on the court," a separate ground for denying recognition of a foreign judgment, this allusion only relates to the likelihood that the expert reports tainted the final judgment.

44

4.   Document Production and In Camera Review

Chevron has thus carried its burden of demonstrating that the crime-fraud exception applies to the creation of the Calmbacher report, the Cabrera report, and the cleansing memos.  Mr. Woods is therefore directed to produce all of the documents identified on his privilege log that relate to these reports.  Any of Mr. Woods' documents not produced directly to Chevron pursuant to this order shall be produced to me for in camera review to determine whether they in fact fall under the crime-fraud exception as detailed here. See In re Omnicom, 233 F.R.D. at 405 ("'[T]he decision whether to engage in an in camera review of the evidence lies in the discretion of the district court.'" (quoting Jacobs, 117 F.3d at 87)); see also United States v. Zolin, 491 U.S. 554, 572 (1989) ("[A] lesser evidentiary showing is needed to trigger in camera review than is required ultimately to overcome the privilege."). In conducting that in camera review, I will also consider Chevron's outstanding objections to Mr. Woods' privilege log.  (See Pl. Garr/Woods Memo. at 8-10, 12-13; Chevron Corporation's Motion to

---

See Chevron Corp., 768 F. Supp. 2d at 637.  All of the remaining language in his discussion indicates that his holding is limited to the issue of fraud, and his discussion is entirely focused on the submission of fraudulent expert reports.  See id. at 636-37 ("In all the circumstances, Chevron has raised substantial questions that present a fair ground for litigation as to whether the Ecuadorian judgment is a result of fraud practiced on the Ecuadorian tribunal . . . .").

Compel Andrew Woods and Laura Garr to Produce Individual Documents
Listed on Their Privilege Logs at 2-4).

<u>Conclusion</u>

For the reasons discussed above, Ms. Garr's objections to
Chevron's subpoena based on the attorney-client privilege and the
work product doctrine are overruled, and she shall produce each of
the documents on her privilege log forthwith.  Mr. Woods'
objections are overruled except to the extent that they relate to
documents which were created after October 20, 2010 but which are
not encompassed by the crime-fraud exception as described above.
Mr. Woods shall produce all documents for which his objections have
been overruled and shall submit for <u>in camera</u> review by August 8,
2011 all other documents identified in his privilege log.  The Kohn
Respondents' objections are overruled, and they shall produce the
requested documents except for those inadvertently identified in
their privilege logs that were not, in fact, responsive to
Chevron's subpoena.  Except for the obligation to submit documents
to me for <u>in camera</u> review, this order is stayed until 5 p.m. on
August 8, 2011 to permit any party to file objections with Judge
Kaplan.  This Memorandum and Order resolves the motions identified
as Docket Nos. 25, 35, and 100.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       August 3, 2011

Copies mailed this date:

Randy M. Mastro, Esq.
Kristen L. Hendricks, Esq.
Anne Champion, Esq.
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, New York  10166

Andrea E. Neuman, Esq.
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA  92612

William E. Thomson, Esq.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA  90071

Carlos A. Zelaya, II, Esq.
F. Gerald Maples, Esq.
F. Gerald Maples, PA
365 Canal Street, Suite 2650
New Orleans, LA  70130

Julio C. Gomez, Esq.
Julio C. Gomez Attorney at Law LLC
111 Quimby Street, Suite 8
Westfield, New Jersey  07090

Elliott R. Peters, Esq.
John W. Keker, Esq.
Christopher J. Young, Esq.
Jan N. Little, Esq.
Matthew M. Werdegar, Esq.

47

Nikki H. Vo, Esq.
Paula L. Blizzard, Esq.
William S. Hicks, Esq.
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA  94111

Seth D. Ard, Esq.
Susman Godfrey LLP
654 Madison Avenue
New York, New York  10065

James J. Rohn, Esq.
Patricia Hamill, Esq.
Joshua J. Voss, Esq.
Conrad, O'Brien Gellman & Rohn, PC
1515 Market Street
Philadelphia, PA  19102